Good morning, your honors. Jameel Allen on behalf of Abel Montoya. I'll be splitting time with Code Defendant's counsel. We've agreed that I'll use nine minutes to address enhances by acquitted conduct and attempt to reserve one for rebuttal. Okay. Under the circumstances of this case, due process required the Code Defendant to be present and testify in court in order for his statement to be deemed sufficiently reliable. This case presents unique facts. You're talking about Ruiz. Is that Ruiz? Yeah, when I refer to Code Defendant, Mr. Ruiz. Right. Under the circumstances of this case presents unique facts because Abel Montoya's sentence was quadrupled and his brother's significantly enhanced based on the use of acquitted conduct using as its basis the presumptively unreliable hearsay statement of a non-testifying Code Defendant under the higher clear and convincing evidence standard. The evidence necessary to prove the enhancement was the post-arrest statement of Ruiz Bracamontes, but that statement was unreliable because it was provided by a convicted felon under pressure of interrogation by agents to admit to a drug conspiracy, provided strikingly little detail as to the arrival of any agreement, and it made an effort to minimize his own involvement while spreading greater blame to Abel and Rosario Montoya. Well, it certainly was very damaging to both your clients, understood, but you're saying at the heart of the issue is that are you saying your clients had to write under the statute to testify in order for the court to take that into account for sentencing? What we're saying, Your Honor, is what's required. The issue is what's required under due process to, one, determine specific purpose and objective under clear and convincing evidence and also to determine sufficiency of reliability. This court is not constrained by the holding in U.S. v. Watts. That case was decided or limited to double jeopardy. And also, the premise in that, the basis in that case was Williams v. New York. Well, see, as I understand your argument, it's that this was hearsay. Correct. Right? A codefendant, generally notions about unreliability about a codefendant. Correct. But — and your argument is, is that it was just so unreliable, it violated due process. That's the argument, right? Correct. Unreliability. But the test for unreliability is, you know, it's pretty low. Actually, in this case, it's pretty high because this Court — Well, then you're conflating the two. You're saying that you could only use the testimony of the — or the information provided by the — by Ruiz to determine what's sufficient   If it was clear and convincing, that's what makes it reliable. If there was a sufficient indicia of reliability under the clear and convincing evidence standard, that's sentencing. Well, why was — so, as I understand what happened here, Ruiz is interviewed twice out — Three times. — the night of the incident, correct? Three times. Three times. And he changes his story, I guess, the last time, right? Correct. Okay. But then later on, I don't know how far — how much time it elapses, but he then agrees to plead guilty, right? Correct. And he signs a plea agreement, right? Yes. And he appears in front of the magistrate judge for a change of plea hearing. Correct, Your Honor. Right? And the magistrate judge goes over with him the plea agreement. Correct. Right? I didn't hear that. The magistrate judge. Accepted the plea agreement. Yes, goes over it with him, and although the facts in the plea agreement are laid out, he answers yes to everything, correct? Right. So — and he's under oath, correct? Yes. So why — I mean, if you put it all together, why isn't that — why doesn't that provide some sense of reliability for the district court judge at the time of sentencing? Well, at the time — because in this particular case, unchallenged statements, unchallenged oaths aren't inherently reliable when they're not observed by the district court judge. That's — this Court's distermination in U.S. v. McGowan. But in addition to that, this was a — it was a fleeting yes-and-no response and engagement between Ruiz-Barcomontes and the district court — well, and the magistrate judge, where he answered yes and no to a statement provided by — or prepared by the government. And in order to accept that — in order to accept his plea agreement and have charges dismissed and have his advisory guideline range reduced, he had to agree to that statement. Okay. But those statements aren't in a vacuum, though. Aren't they corroborated in part by some of the evidence that was presented in the case against your clients? Not in this particular case, because there was no meaningful corroboration, and the judge didn't consider the pivotal factors of unreliability. In sentencing judge's order, she herself stated, excerpt of Record Volume 2, approximately page 18, that the statement is what provided — provided by clear and convincing evidence, purpose. Under 2K1.1 and 1B1.3, she's required to determine what specific objective and purpose is. But she heard it at the trial. She heard the testimony of the officers when they stopped the three individuals out in the desert. Correct, Your Honor. Correct. And even hearing that information, the district court still had to rely on the statement to determine specific purpose and objective. But Judge Kobayashi said it. Well, you have to look at the whole context, right? Well, and then we'll be sure. So they had the information about the pieces of, you know, the items that they found out there at the site. Even if we assume some criminal activity or conspiracy was at play, the evidence at the scene was insufficient or didn't establish specific objective and purpose. And going back to your question of looking at the entire situation that was at play, what's very troublesome in this case is there was significant time off tape here, approximately 73 minutes, 25 of which came before Ruiz launches into this evasive, lack-of-detail-oriented confession where he — the agents impermissibly mentioned his children. They had — he had been threatened with 30 years in prison. And also, they had some kind of discussion off tape regarding the subject matter of the investigation. Understood. And I think if we were looking at, you know, his conviction, you know, whether there was sufficient — it would be a different issue. But we're looking at sentencing. We're looking at the fact that she has all of this information, the sentencing judge has all this information, plus all of the information that was adduced at trial. So there's independent, scattered pieces of evidence that support a lot of what Mr. Ruiz said and that she relied on in his sentencing. Wouldn't that be fair to say? But you're saying it doesn't meet the level of scrutiny that we're supposed to — under clear and convincing? Is that what you're arguing? Well, the use of the statement, the use of the statement with the statement being unreliable — See, that's — — resulted in a due process violation. Okay. But that's what I'm trying to look at, the unreliability of it. I understand what you're saying about the conspiracy and so forth, and clearly the trial judge agreed because she granted the judgment of acquittal on the conspiracy charge, right? Yes, Your Honor. Okay. So — but for sentencing purposes, when she's looking at that, she's looking at Mr. Ruiz's statement, and she's saying, are there other pieces that support what he's saying to tend to find it reliable? Well, when we look at the record in its entirety, the agents fed him details about the subject matter and evidence found at the scene. So that would negate reliability under these circumstances. And because there's a true question of reliability, this is similar to this court's determination in U.S. v. Jordan, where there's a question of was there a gun or was there not a gun? Well, this court did determine under certain factual circumstances the credibility and reliability of a witness should be tested through cross-examination at the sentencing phase almost out of time. I'd certainly answer more questions, but I'd like to reserve a few seconds. Okay, that's fine. We'll hear from your co-counsel on any other case. Good morning, Your Honor. My name is Brenda Dabdio on behalf of Abel's brother, Rosario Montoya Gajayola. And if I could just add a little bit to my colleague, the other important factor and critical factor in this case is that Mr. Ruiz Bracamontes indicated at the time right before trial when we had the hearing, his counsel wanted to suppress the subpoena. One of the reasons he wanted to suppress the subpoena is the fact that he didn't want to perjure himself. And the only statement that was on record that he could possibly perjure himself about is the statements he made about our clients. And so the court at that time could have asked follow-up questions to, perjury, what are you talking about? And if there's a possibility of perjury, let's see if the government can grant some kind of immunity at that point. That would have given us some more reassurance necessary that his statement is reliable. But with an unreliable statement, not willing to testify, indicating by his counsel that he didn't want to perjure himself, that on top of the fact that what was relied on by the court, the scanner to indicate a conspiracy, the scanner, the cell phone, all of those facts are indicative of a person crossing illegally. There's nothing indicative of those facts that they found at the scene that there's a drug conspiracy going to be committed. What puts it together is the unreliable statement of Fermin Bracamontes. And that's why altogether it is not meeting the clear and convincing standard that the court alluded to in making that enhancement under 2K2.1. But you're assuming he's saying he doesn't want to come because he doesn't want to perjure himself because his statement was untrue, as opposed to he'll take the stand and deny it because he doesn't want to testify face-to-face against his friends. I believe that in the motion to suppress, he indicates that he didn't want to perjure himself. Right. But you don't know if it's because his statement is untrue or if he would claim it was untrue under oath, which would be a lie, arguably, because he just doesn't want to have to rat out on his friends. That may be true, but that's even more of the reason why we don't know. So there's not saying it's causing question the reliability. So then we look at the extrinsic evidence that was at the scene. But didn't it also include, I thought, a drug scale or scales used to weigh things? No, no. They referred to a police scanner. Right. They referred, which on top of that, okay, they had the weapons, but there was the testimony of the agents in this case was all over the place. You had the test, which made it even more questionable and suspect what actually happened out there. If you recall, there were different testimonies from Agent Abakurma that indicated he was the first one on scene. He searched my client, Rosario, and found one shotgun shell. Then later, six or seven hours later, Agent Garcia testifies that he found five more shotgun shells in his pocket. It wasn't in his report. The only reason we found out about it is because in cross-examination, Agent Abakurma said, no, I only found one. But in his report, it indicated he had found six. So that was one thing that didn't make sense. The other thing that didn't make sense was the fact that there was a scanner. Abakurma also said that the scanner was not on. He pulled it out of a backpack, and it wasn't on. Then we have another agent that comes later and says, oh, yes, that scanner was on, and it was on to Duval Mines. And you kind of see a pattern with these agents where they are creating the evidence, and they're working with what they find. But how does that go to the reliability of the co-defendant who pled, and she relied on his statements? I mean, there's other meaningful corroboration, right, at the scene, the guns, the rations, cell phones, carpet booties. Well, that could go towards anybody crossing illegally. That doesn't necessarily mean that there was a conspiracy to commit drugs. Even if you're just crossing illegally, you can arm yourself so you don't get robbed, not just necessarily because you're robbing a backpacker. You need a cell phone if you get lost. You need food to eat because you don't know where you're at. All the other factors do not indicate that there's a drug conspiracy. Do you want to address the jury instruction issue? Yes, I would like to. Because you're running out of time. Yes, Judge, I would like to address that. And we're asking the court to grant a new trial based on the fact that the district court did not include an essential element of that offense. The essential element, it was brought up to the court. We looked at Gergen. Gergen specifically says that it's an essential element. The government has argued that it's a harmless error, if anything. But when you have an issue of constitutional magnitude, where we do here, where it's an essential element and you're taking that away from the jury, it's not harmless error. I don't think the court can find that an essential element, not allowing the jury. I would have to say it's beyond reasonable doubt. I think it is. I'm sorry, Judge? Beyond reasonable doubt, you can say that it's harmless. Well, you can't say it's harmless when you're taking something away from the jury and it takes away from the fairness of the proceedings. We have lots of cases where instructions are wrong. You're basically saying it has to be structural. You can't have a beyond a reasonable doubt harmless error standard. But, in fact, we do. So the fact that it's constitutional doesn't end the question. The question becomes, could a jury, is it beyond a reasonable doubt that a jury would have made the same conclusion? Suppose you had a sawed-off shotgun where the barrel was sawed off to, like, 2 inches. And the issue is whether the defendant knew it was shorter than, what is it, 18 inches, it says in the statute. In that case, that's pretty extreme. It would be pretty hard to conclude that the defendant didn't figure out that this was sawed off. And so this Court might well say, beyond a reasonable doubt, that's harmless error. Your argument is that, in this case, that's not so clear. That's correct, Judge. And I'm out of time. Thank you. Thank you. I'll give you some time for rebuttal. Thank you, Your Honor. Good morning, Your Honors. I'm Assistant U.S. Attorney Angela Woolridge here on behalf of the United States. Clear and convincing evidence was presented at trial alone to prove that the defendants were involved in a conspiracy to commit some illegal offense. And then together, at both trial and sentencing, to prove, by clear and convincing evidence, that they were in a conspiracy to commit a drug trafficking offense. The evidence at trial was significant. The defendants were found in an area heavily used by illegal drug traffickers. They were in possession of a number of items consistent with drug trafficking activity, multiple cell phones and the battery charger to signify that they planned to be in that area for some time. The radio scanner, backpacks, rations, camping supplies, again, suggesting spending a lengthy period of time in that area. And the ammunition and the firearms themselves. But I think the argument, though, on the defense side, it has to do with the statements itself and also the mistakes or contradictions by some of the agents' testimony. So could you address that, the fact that there's a lack of specificity, he's just admitting to certain stock statements that the government placed in the plea agreement? Certainly. Well, first of all, the statement made under oath in front of a magistrate judge at the time of the change of plea was provided in a plea agreement that the defendant signed and then, again, although there were yes or no questions, verbally assented to under oath at the time of his change of plea. But that was, as Your Honor pointed out, not in a vacuum. It was corroborated by his statement given to agents the night of his arrest. It was corroborated by this evidence at the scene. But most importantly, it was not contradicted by any evidence. There was no evidence presented that suggests in any way that these defendants were not engaged in such a conspiracy, that they were in the desert with all of these items in this remote location known for this illegal activity with some sort of innocent purpose. There was no other alternative explanation offered. There's no other. They're offering an alternative, not an innocent purpose, but another illegal purpose, but less offensive or less violent. They weren't a rip crew trying to steal drugs. They were illegally entering the United States. So they're not saying there was a benign or innocent purpose. Certainly. And it's worth, I think, pointing out that although I think that there is enough evidence to suggest otherwise, that it was the drug trafficking purpose, especially considering the co-defendant's statement, it's worthy to note that both of these defendants were convicted of and actually pled to the felony of offense of unlawful reentry. So even if that ---- So the focus here is on the drugs. Correct. And is there any evidence to support the drug connection other than the statement of the co-conspirator? There is, Your Honor, and that's the statement of, I believe, no less than five law attorneys that have testified to the drug connection, just their behavior of kind of camping out in this area of the desert, all of the items, the scanner, the battery charger. Well, is that anything other than the inference of other observers? I mean, is there ---- What's the evidence that leads them to say drugs were involved? And what evidence is there that ---- To tell me that, well, I know and I looked at it and I think they're guilty of drugs, too, really doesn't offer a lot of corroboration as to the drugs being involved. Your Honor, but again, perhaps by itself, that purpose of the conspiracy, clearly there was a conspiracy in the court found, even based on the evidence presented at trial, without the statement of the co-defendant, there was some sort of conspiracy for unlawful activity. But again, that isn't in the vacuum. We do at sentencing then have the co-defendant statement that does have, meet that standard of some minimal indicia of reliability. It was made under oath. He had no motivation to lie or fabricate against either of these two defendants. He did not have a cooperation agreement against them. He was not going to testify and did not testify against them. He did not shift the blame to them. If you look at the factual basis for his plea agreement, he mentions them, that they were all involved in the same conspiracy, but he doesn't assign a larger role to either of those defendants than to himself. He doesn't shift the blame. He inculpates himself just as much as anyone else and, in fact, was sentenced to 111 months based on those statements. So there's nothing self-serving at all about that plea agreement, about that statement under oath. So what did he get out of his plea agreement? There were one charge against him, I believe that was dismissed. There were a charge or additional charges against him that were dismissed. And so he did face some less time than if convicted of all of them. However, again, he pled guilty on the offenses that the factual basis provided for, that the factual basis that he was engaged in the conspiracy with the co-defendants provided for. So to admit to those facts is what gave him the 111-month sentence. What should we make of counsel's arguments about his refusal to honor the subpoena and the claim by his counsel that he was going to perjure himself? Is that something that the district judge should have mentioned and taken into account and balanced in relying and determining that his statements were reliable at the time of sentencing for the two defendants? Your Honor, the co-defendant named a number of reasons he didn't want to testify. One of them is that he may perjure himself. Again, this is he didn't say that he would, and he certainly didn't say that he had. And that's an important part. He never said that he had perjured himself. He was worried that he may. And as the Court pointed out, most likely the more reasonable explanation for that is that when sitting at trial facing the defendants, facing those who he's accusing and who were his associates and his accomplices in this matter, he wouldn't want to testify against them and therefore may perjure himself. But again, the fact that he said that he may perjure himself in the future, referencing in the future rather than that he had in the past, leads us to no reference that he perhaps did at this change of plea hearing. I don't think that provided any reason for the district court to have to hold a further inquiry about that. If I may address the jury instruction, unless there are other questions about that. Any error in that final instruction given by the district court for Defendant Rosario Montoya Gajiola's possession of an unregistered firearm was, in fact, harmless. Do you agree that the instruction was erroneous? I'm sorry, Your Honor? Do you agree that the instruction was erroneous? Your Honor, I believe that under the case law we do have to concede that point. The instruction that the Court originally was going to give and that was submitted by the government was the model, this circuit's model instruction. However, upon request by the defendant, the jury instruction was changed. The defense requested an instruction that the defendant had to have knowledge that the firearm was illegal. That is not required. However, after some negotiation, the Court did change the instruction, and I do believe that because of that change we do have to concede error in this case. However. Go ahead. However, it is clear beyond a reasonable doubt that even without that error, if the model instruction or if the correct instruction was given, the jury would have found the defendant guilty of this charge. How can that be in the wake of Gergen? Because, Your Honor, if the jury found that the defendant knowingly possessed that particular shotgun, which they did find under the instruction, the instruction still required them to find that, and that was uncontested at trial. Wait. Was it uncontested? That he possessed that shotgun? Yes.  No, no. I'm sorry. The size of the shotgun. Isn't that really the issue? Not that he possessed the shotgun, but the shotgun has to be a certain size. Right. It was uncontested that the shotgun was a certain size. There wasn't an issue, you know, of maybe it really was more than 18 inches. What was contested was or what is contested now is whether it was proven that he knew that characteristic. Right, his mens rea. Exactly, his mens rea. But, Your Honor, you bring up a good point. There was no evidence to suggest that he did not. Although, again, now he contests this finding on the basis of the jury instruction, there was no evidence to suggest that he hadn't had ample opportunity to observe the shotgun, that the shot, that the characteristic of the shotgun wasn't readily visible. In fact, all the evidence is to the contrary. Every witness that testified about that shotgun and that had seen that shotgun, I believe it was no less than 4. How long was the barrel sawed off to? 14-1⁄2 inches, Your Honor. How long was the barrel sawed off to in Gergen? The answer is 13-1⁄2 inches. And what was our ruling in Gergen? It wasn't harmless. In Gergen, Your Honor, though, if I may, there was evidence that that firearm was concealed, at least partially, and there wasn't uncontroverted evidence, as we have in this case, that the defendant had handled the full firearm, certainly that he had handled it at some point. But at the time it was found and there was no evidence, there was no statements or anything otherwise, it was at least concealed such that a person may not have been able to observe that characteristic. This case is distinguishable because the firearm was in no way concealed. It was completely uncovered. It was completely red. That characteristic, that short barrel, was very readily available. And we have the defendant admit that he had found the shotgun either the day before or a few days before, that he had been carrying it for some time, and that he had manipulated it. He was familiar with it. So there was no evidence to suggest that there was, as there was in Gergen, that there was anything that would have impeded him or prevented him from observing that characteristic, which the court even said, having seen the shotgun, and the jury got to see the shotgun as well, having seen the photograph, which has been provided in the supplemental excerpts, that even a person with little or no knowledge about firearms would have readily observed that it was short barreled, that there was something that had been altered about it. So that, Your Honor, I believe is what distinguishes this case from a case in which there was some question about whether the defendant ---- Right. I think in Gergen it was wrapped up in a towel and it was in, like, the back of the car. Correct. And this was open. And as you said, there's some testimony about him actually handling it. But wasn't there a defense witness, one of their investigators who testified and said, I looked at it, I can't tell how long the barrel is, or something to that effect, who contested? No? There was no testimony that raised into question the length of the barrel. Your Honor, I don't believe so, and I'm sure my colleague will correct me if I'm wrong, but I don't recall from the record any controverting evidence. Okay. So your argument is from the photographs, from the actual gun that was presented, any reasonable person could take a look at that and know that the barrel was less than 18 inches? Correct. Your Honor, in addition, I believe four law enforcement agents, essentially all of them that had testified that they had seen the gun, testified that immediately upon seeing it, they recognized it as being short barreled. It had been sawed off, if you will. So that any reasonable juror ---- Well, the question, though, is whether the defendant did. Somebody who's a law enforcement officer is probably more likely to be able to detect something like that than the average citizen. Correct. Is there any average-type person that spoke and said, yes, I can tell that's less than 18 inches right off? No, Your Honor, but the jurors, as average people ---- Well, if they'd been asked to. But the problem is they weren't asked to. They weren't, obviously, they weren't asked on their opinion, but they had the ability because they received the photograph and evidence, because they physically saw that firearm, they could make that ---- Well, they didn't see the act. It wasn't brought into the courtroom, was it? It was, Your Honor. It was? It was. Was it? Yes. It did not go back to them in the jury room, but it was admitted into evidence. It was shown to them at the time of trial, and they were also told that should they wish to further examine it, that it would be brought to them under the presence of a marshal or some security so that for them to look at during their deliberations. But they did get the photograph during their deliberation as well, and that's the same photograph that's been provided to the court. Okay. But then the question becomes, because it's not in the jury instructions, did they actually determine that? Your Honor, and again, that is where we're arguing that even if they had not, for them to determine, as we know they did, that he knowingly possessed a firearm, that the fact that that characteristic of that firearm was so obvious that they never would have had to have found that element, that mens rea element, that's that issue as well. Because it's so evident from looking at it? Exactly. And from the testimony and from the firearm in the photograph as well. Unless there's any questions for me, I won't take up any more of your time. Thank you, counsel. Let's see. Yeah, I believe you had a – I'll give you a minute for rebuttal. Thank you, Your Honor. Yeah. Cooperation is relevant to two aspects. One, the criminal activity. Your Honor's noted lack of specificity here, and the district court had the same concerns. Based on her ruling at the sentencing court, she was unable to make a finding that the evidence, the trial evidence, supported specific objective and purpose. Without specific objective or purpose in this case, she couldn't apply the enhancement. And then with also regard to cooperation of the statement, we can't say the evidence at the scene meaningfully corroborated this co-defender, Rich Bracamonte's, statement in light of the way he was interviewed with the agents providing the subject matter, with the agents providing specific details of evidence that was seized, with there being significant periods of time off tape where they clearly had discussions about the subject matter. And that's what I wanted to address was the cooperation, unless there are any  Yeah, thank you. Thank you, Your Honor. Thank you, counsel. We appreciate your arguments, and the matter is submitted at this time.
judges: Paez, Clifton, Kobayashi